**ASIATIC PETROLEUM CORP. and E. F. Philbin**

v.

**UNITED STATES.**

**C.D. 2137; Protest No. 316471–K.**

United States Customs Court, Third Division.

Dec. 4, 1959.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue and Howard Clare Carter, New York City, of counsel), for plaintiffs.

George Cochran Doub, Asst. Atty. Gen. (William J. Vitale, Murray Sklaroff, New York City, and Henry J. O'Neill, Washington, D. C., Trial Attys.), for defendant.

Before JOHNSON, DONLON, and RICHARDSON, Judges.

DONLON, Judge.

Plaintiff imported from Holland a preparation for the lubrication of marine diesel engines. This preparation is sold under the trade name Shell Alexia Oil A. The collector classified it under paragraph 1558, 19 U.S.C.A. § 1001, as an unenumerated manufactured product, dutiable at the modified rate of 10 per centum ad valorem, and plaintiff protested the classification. It is plaintiff's contention that this preparation should be classified as a distillate obtained from petroleum, entitled to duty free entry under paragraph 1733, 19 U.S.C.A. § 1201.

Plaintiff also claims that if we should decide this suit in its favor on that issue, then it follows that the collector should have imposed internal tax on the imported merchandise under section 4521 of the Internal Revenue Code, 26 U.S. C.A. § 4521 at the rate of 2 cents per gallon, which is the modified rate of internal tax on lubricating oil. The collector did not assess any internal tax on this merchandise. In this respect, the protest seems to attack, but only on a conditional basis, some alleged decision of the collector that this merchandise is not a lubricating oil and, therefore, not subject to internal tax as such.

■ We are of opinion, as defendant argues, that this suit raises no litigable issue as to internal tax. Besides the grounds that are advanced by defendant in that respect, it clearly does not follow, as plaintiff seems to argue, that a lubricating preparation which may be taxable under section 4521 of the Internal Revenue Code is *ipso facto* a distillate obtained from petroleum within the duty free provision of paragraph 1733 of the Tariff Act of 1930, or *vice versa.*

We proceed to consider the issue which the protest properly raises, namely, whether this imported Shell Alexia Oil A is, for tariff purposes, a distillate obtained from petroleum within the congressional intent in enacting paragraph 1733. Plaintiff does not claim any classification other than under paragraph 1558 in the event that we overrule plaintiff's claim for paragraph 1733 classification.

Shell Alexia Oil A is made from certain basic lube stocks. Those stocks are distillates of petroleum. The record makes that fact clear, and neither party disputes it. After the distillates have been mixed together, or blended, there are added to the blended mixture of distillates certain chemicals, including sulfonates, calcium sulfonates, and calcium acetate. These, which are known as "lube oil additives," may be in volume as high as 5 to 7 per centum of the mixture, or as low as 0.3 or 0.4 per centum.

For reasons not made entirely clear in the testimony, the proportions vary considerably.

These chemical additives will not blend into the basic lube stock if they are introduced directly into the mixture. There has to be an emulsifier. The emulsifier used is water, plus a "coupling agent" additive. The water used is considerable, as much as 30 per centum of mixture volume. The mixture of basic lube stocks, chemical additives and water with coupling agent additive, is emulsified. Emulsification is the process of dispersing the fine particles or globules of a liquid into a liquid.

Paragraph 1733, in relevant part, provides as follows:

"Par. 1733. Oils, mineral: Petroleum, crude, fuel, or refined, and *all distillates obtained from petroleum,* including kerosene, benzine, naphtha, gasoline, paraffin, and paraffin oil, not specially provided for." [Emphasis supplied.]

In United States v. Esso Standard Oil Co., 42 CCPA 144, C.A.D. 587, our appeals court reviewed court decisions, dictionary definitions (including definitions from technical as well as general dictionaries), and also the report that was before Congress when the provision "distillates obtained from petroleum" was substituted, in the Tariff Act of 1922, for the prior provision "products obtained from petroleum" of the Tariff Act of 1913. As to the meaning of the term, our appeals court said, in the Esso case, supra, at page 155:

" * * * In the common meaning of the word, a distillate is so-called because something significant happened to it in the distillation process, i. e., it was separated, or purified, or identified *by* distillation. Kerosene, or gas oil, for example, are practically indefinable without reference to distillation or its effects; they owe their identity to the process of distillation." [Emphasis quoted.]

Plaintiff has adduced the testimony of three witnesses, all qualified as experts in various phases of petroleum processing.

Mr. Erwin Landau holds the degree of bachelor of science in chemical engineering and also the degree of science in chemistry. He has had many years of technical experience in petroleum refining. For the past 14 years, his experience has been more particularly with lubricating oils.

Mr. R. M. Henshaw holds the degree of mechanical engineer. He has had 30 years of experience in the oil business, the last 15 years with Shell Oil Co. as marine representative in their lubricants department.

Mr. E. G. Travis is a technologist in charge of "quality questions" in the manufacturing division of Shell Oil Co., a position which he has held for 16 years.

The testimony of these expert witnesses, as developed on direct examination and cross-examination, may be summarized in relevant part as follows:

Lubricating oils function to reduce friction, dissipate heat, protect against rust or corrosion, and clean away sludge. (R. 16.) All lubricating oils are prepared by a process, which was described by Mr. Landau as follows:

"* * * the heavy distillate fraction of petroleum crude oil is further distilled under vacuum, which is then followed by a solvent extraction, which is followed by a solvent dewaxing, then occasionally is followed by acid treatment, and then clay filtration, which permits the basic stocks to then be run down to separate storage tanks.

"Now, these basic stocks are later blended together in mixing tanks, to meet—well, they are blended together in the right proportions, or formulation, to meet certain specifications of viscosity and flash and gravity, and then to this mixture is added a chemical or chemicals, which are known as additives. These are mainly used to enhance the properties of the lubricating oil. They are —of course, the lubricating oil itself, as represented by the basic stocks, has four main aspects, namely, slipperiness, the ability to cool, to clean, and to impart anticorrosion." [R. 15.]

The process by which Shell Alexia Oil A is prepared was described by witness Landau as follows:

"* * * the process is very similar to the one that we outlined previously, only *in this case after the lube basic stocks are mixed together the additives are introduced in a water solution.* This water solution— there is a considerable amount of water, by the way—is necessary in order to keep the additives in while dispersed in the mixtures. If you were to try to introduce as much of the alkaline metallic additive, without the water solution, it wouldn't stay dispersed in the mineral oil. But the additives are only there to enhance the property of this lubricating oil mixture." [R. 17; emphasis supplied.]

The additives make no chemical change in the base stocks. (R. 17.) They enhance the existing properties of the basic lube stock. (R. 18.) They do not introduce any new "characteristical function." (R. 29.) The emulsification with water likewise makes no chemical change, but is necessary because otherwise the water and oil would not mix. (R. 19.)

Witness Henshaw testified that the water does not serve any function with respect to the essential purposes of the lubricant Shell Alexia Oil A. (R. 29.)

A base lube stock, in itself, is not adapted to particular applications. It has to be selected and blended. In the case of Shell Alexia Oil A, several base stocks are selected and blended for application to marine diesel engines. Base stock as such, without selecting for the lubricant purpose and without blending, would not be "intelligent lubrication." (R. 31.)

Defendant called no witnesses. The only proof defendant offered is a report of the United States Customs Laboratory at New Orleans (port of entry of this merchandise) on analysis of a specimen taken from the entered merchandise. The analysis is brief. It is as follows:

"The sample is an aqueous emulsion of mineral oil, the calcium salt of a sulphonated petroleum product, and a small amount of calcium acetate."

It seems clear enough from the record before us that, down to the point where the several selected base lube stocks had been blended, the product was a distillate obtained from petroleum.

The first issue we are called upon to resolve is whether the admixture of chemical additives and a "considerable amount of water" with a coupling agent, and the emulsification of the mixture, was a process of manufacture of the distillate. If not, then plaintiff's case is won. If the described processing of the distillate does constitute manufacturing, for tariff purposes, then we have a second issue to resolve, namely, whether a distillate which has been manufactured to the degree and in the manner here described is, nevertheless, a distillate obtained from petroleum within the *eo nomine* provision of paragraph 1733 and, hence, not an *unenumerated* manufactured article, as defendant contends.

We are of opinion that the processing of the basic lube stocks, here described, was a process of manufacturing. As is well known, it is not necessary that a process of manufacturing shall result in a new article, which is a test for the classification of a manufacture. In general, the verb (as distinguished from the noun) connotes the process of advancing materials in value or toward forms suitable for use, and includes both full and partial work to that end. United States v. C. J. Tower & Sons, 44 CCPA 1, C.A.D. 626; Chas. H. Demarest, Inc. v. United States, 44 CCPA 133, C.A.D. 650; among many such authorities that could be cited.

Applying this test, it appears that the basic lube stocks obtained from petroleum by distillation have been further advanced, after distillation, by processing toward a form to make them suitable for an intended use, the lubrication of marine diesel engines. This is manufacturing.

But is this lubricant an *unenumerated* manufactured article, caught up in the catchall provision of paragraph 1558, or is it an article for which Congress has made *eo nomine* provision? Is this lubricant precluded from free entry as a distillate obtained from petroleum because it has been advanced from its crude state following distillation?

There are three cases that seem to us helpful in arriving at answers to these questions. None is directly in point. None was cited in either brief.

In the Esso case, supra, our appeals court held that imported napthenic acid was obtained by chemical process and not to any effective extent by distillation, and, therefore, could not be called a distillate obtained from petroleum. The court discussed distillation extensively, saying that in the fractional distillation process it is meaningless to call anything a distillate which has not been effectively separated by the distillation process. The holding in the Esso case was that the napthenic acid of that litigation was a product obtained by chemical process and not a product effectively separated by fractional distillation of petroleum. Hence, it was not necessary for the court to decide, in that case, whether Congress intended to embrace in paragraph 1733 only the crude fractions separated by distillation of petroleum, which is a consideration germane to our decision here. Pointing out that Congress, in the 1922 act, carefully chose its words to limit the items given free entry under the petroleum paragraph, the court noted the significance of the change from the language of earlier tariff acts, "products obtained from petroleum," to the language of the 1922 act, "distillates obtained from petroleum." The court, in its opinion, also quoted from the Tariff Com-

mission's "Report to Congress Suggesting A Reclassification of Schedule A And Of Related Provisions Of The Tariff Act of October 3, 1913," published by the Government Printing Office, 1921, at page 118, as follows:

"(5) It is suggested that the word 'products' be changed to 'distillates,' because it is believed that the intent of this paragraph was to include only such products as gasoline, benzine, and naphtha, which are *obtained* from petroleum *by* distillation processes. Petroleum is also the crude material from which a number of refined chemical compounds, e. g., ethyl chloride, isopropyl alcohol, etc., can be prepared *by complex methods of chemical synthesis.* These materials are more highly manufactured products, which presumably are dutiable under general provisions in Schedule A, although there is at least the possibility that they might be regarded as 'products obtained from petroleum.'" [Emphasis added by our appeals court in the Esso opinion.]

In United States v. General Dyestuff Corp., 29 CCPA 53, C.A.D. 170, our appeals court, in 1941, held that certain imported wax had been manufactured and was not duty free under paragraph 1796, 19 U.S.C.A. § 1201 as an animal, vegetable, or mineral wax.

In Adolphe Hurst & Co., Inc. v. United States, 33 CCPA 96, C.A.D. 322, the appeals court, in 1946, expressly overruled the earlier decision in General Dyestuff. Agreeing that the process to which the crude wax had been subjected constituted manufacturing, the court held that this wax, although advanced in value or condition by a manufacturing process, was still wax and suitable for use as such and, not being otherwise specially provided for, was not precluded from free entry merely because it was not in its natural or crude state.

In the Hurst case, crude montan wax (mineral) had been processed with certain chemical elements and compounds not found in natural wax, and the product had chemical and physical properties that were not present in natural wax. The processed product was advanced to a condition which fitted it for uses to which the basic or crude material was not adapted. The product, however, was a wax suitable for use as such. Noting that the attention of Congress had been called (in the Summary of Tariff Information, 1929) to the fact that crude montan wax, brown in color, is processed by distillation with superheated steam until nearly white, and also is refined with sulphuric or nitric acid, our appeals court concluded that there was nothing to indicate that it had occurred either to the Tariff Commission or to Congress that bleached and refined montan wax was not free of duty as wax under paragraph 1796.

There is no *eo nomine* provision for lubricating oil or for lubricants. There is *eo nomine* provision for distillates obtained from petroleum. This is a class of considerable extent, just as is the class of animal, vegetable, and mineral wax that was construed in the Hurst case. One of the fractions obtained from petroleum by distillation is the substance commonly known as lubricating oil. The crude material of this merchandise was that distillate.

The reports before Congress both when the Tariff Act of 1922 and the Tariff Act of 1930 were enacted include information as to "lubricating oils" in the material which is related to paragraph 1733. The report prepared for the negotiators of the General Agreement on Tariffs and Trade similarly discusses lubricating oils under paragraph 1733. Summary of Tariff Information, 1921 (prepared by the United States Tariff Commission pursuant to a request by the Committee on Finance of the Senate in connection with enactment of the Tariff Act of 1922); Summary of Tariff Information, 1929 (compiled by the United States Tariff Commission, for use of the Committee on Ways and Means, in connection with an examination of the Tariff Act of 1922;

and enactment of the Tariff Act of 1930); Summary of Tariff Information, 1948, volume 1, part 6 (prepared by the United States Tariff Commission in response to a resolution of the Ways and Means Committee of the House of Representatives, adopted July 25, 1947, bringing up to date commodity summaries of Tariff Information).

There is nothing in all of this material to indicate that either the Congress or the GATT negotiators thought that the provision for distillates obtained from petroleum did not include such distillates after processing in usual course for marketing as lubricating oils.

The record before us is explicit that the described processing of Shell Alexia Oil A effected no chemical change in the distillates, or basic lube stocks. Existing chemical values were fortified and improved. There was physical change, that is, change in form, due to emulsification. Change in form has been held not to remove an article from *eo nomine* provision. T. M. Duche & Sons, Inc. v. United States, 44 CCPA 60, C.A.D. 638.

 We are of opinion that this merchandise has been manufactured; that the provision for distillates obtained from petroleum is not limited to such distillates in their crude state; that Congress intended that the heavy fraction obtained from petroleum by distillation should be admitted under paragraph 1733 as lubricating oils; and that the Shell Alexia Oil A of this suit, although advanced in use by a manufacturing process, is such a lubricating oil as Congress intended within the duty free provision for distillates which are obtained from petroleum, in paragraph 1733.

Without deciding whether or not this merchandise is subject to internal revenue tax, but solely on the ground that this issue is not here before us, the protest is overruled as to the issue of internal tax. The protest claim for duty free entry under paragraph 1733 is sustained. Judgment will be entered accordingly.